IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MANUEL ACOSTA, on Behalf of Himself and All Other Similarly Situated Individuals; LUIS MONTOYA, on Behalf of Himself and All Other Similarly Situated Individuals; and MARTIN HINOJOSA, on Behalf of Himself and All Other Similarly Situated Individuals;<br><br>        Plaintiffs,<br><br>    vs.<br><br>TYSON FOODS, INC.,<br><br>        Defendant. | **8:08CV86**<br><br><br>**MEMORANDUM AND ORDER** |

This matter is before the court on the parties' cross-motions for summary judgment, Filing No. 117 and Filing No. 119.[1]  This is a class action for unpaid wages under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201, and Nebraska wage and hour laws.  Plaintiffs, present and former employees of the defendant, allege violations of the FLSA for donning and doffing sanitary and protective gear.

Defendant Tyson Foods, Inc. ("Tyson") moves for partial summary judgment, seeking dismissal of the plaintiffs' state law claims and the plaintiffs' claim for compensation for donning, doffing, and washing at the beginning and end of their meal

---

[1] Also pending is a motion for leave to file a declaration attesting to the accuracy of the plaintiffs' exhibits filed in support of their motion for summary judgment, Filing No. 180, and a motion for leave to file a surreply brief in opposition to the motion, Filing No. 186.  The declaration addresses the defendant's authentication objections to the materials submitted in support of the plaintiffs' motion for summary judgment.  The defendant opposes the motion, arguing that the plaintiffs' proposed declaration does not cure the objections.  Filing No. 181.  Although the defendant's contention may have some technical merit, the court notes that this is a trial to the court and the court will consider only properly authenticated evidence and will give the evidence the weight it deserves.  Tyson contends the declarant authenticating the documents must be a witness and not counsel.  However, most of Tyson's objections are directed to its own documents.  The court finds the motion for leave to file the declaration should be granted and the declaration will be deemed filed instanter.  The motion for leave to file a surreply brief is addressed to the authentication issues.  The court has considered the surreply brief and it does not alter the court's conclusion.  Accordingly, the motion for leave to file a surreply brief will also be granted and the brief will be deemed filed.

period.  The plaintiffs move for summary judgment on the issues of the compensability of certain donning and doffing activities.  The plaintiffs seek a ruling as a matter of law that donning and doffing is "work" under the FLSA and that they are entitled to compensation for pre- and post-shift donning and doffing of both unique and sanitary equipment, as well as for the walking time associated therewith.  It also seeks a ruling precluding Tyson's *de minimis* defense as a matter of law; a ruling that employees must be paid for work they perform during unpaid meal periods; and ruling that employees must be compensated for actual as opposed to "reasonable" time for donning and doffing activities.  They also contend there is no evidence to support Tyson's good-faith defense.

I.  Facts

The following facts are gleaned from the parties' respective statements of undisputed facts.[2]  *See* Filing No. 118, Defendant's Brief in Support of Motion for Summary Judgment at 3-33; Filing No. 120, Plaintiffs' Brief at 1-20; Filing No. 153, Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment at 2-21; Filing No. 157, Defendant's Opposition to Plaintiffs' Motion for [Partial] Summary Judgment at 9-38; Filing No. 171, Plaintiffs' Reply in Support of their Motion for Summary Judgment; and Filing No. 175, Defendant's Memorandum of Law in Further Support of its Motion for Summary Judgment and in Response to Plaintiffs' Opposition at 6-25.

---

[2]As a threshold matter, the parties dispute whether the court is entitled to rely on the stipulations the defendant made in *Lopez v. Tyson*, No. 8:06CV459, Filing No. 237, Pretrial Order at 1-8.  That case involved the same issues at another Tyson facility.  The defendant objects to the plaintiffs' statement of undisputed facts as it relates to the stipulations in the prior case.  The court is able to resolve the motions without relying on the stipulations in the earlier case, so the defendant's objections are overruled as moot.

The undisputed evidence establishes that defendant Tyson has been engaged in interstate commerce or in the production of goods for interstate commerce throughout the relevant time period.  Tyson Fresh Meats, Inc., which is part of Tyson Foods, Inc., owns and operates a slaughter and processing facility in Madison, Nebraska.  The facility employs approximately 950 hourly production employees.  Production operations include Kill, Cut, Converting, Load Out, Rendering, Maintenance and Training.

Most hourly production employees in Kill, Cut, and Converting are paid in part through "gang time," a system that ensures that each employee is paid for the length of production, which is time from when the first piece of meat passes their work station until the last piece passes their work station.  The meat that is processed at the Madison facility is ultimately distributed to restaurant, food service, and grocery store consumers.

Undisputed evidence shows that workers are required to be at their work stations on the production floor when the first piece of meat arrives at their workstation.  Before workers are permitted to work on the production floor each day, they are required by Tyson to don certain sanitary and personal protective clothing.  Among the items that must be donned and doffed and worn by all production workers are a hard hat, a hairnet, a beardnet (as necessary), and earplugs.  Additional items of required personal protective clothing are listed on the Job Safety Analysis.

For purposes of summary judgment in this case, defendant admits that team members who worked in a department with job positions requiring the use of a knife are also required to don and doff frocks or "whites" (which is a uniform consisting of a white shirt and pants), hardhats, ear plugs, hairnets and/or beardnets and, in some jobs,

steel-toe boots.  Employees are not required to don or doff items in any particular order and employees can choose whether to wear mesh items under or over their frock. Defendant admits that nearly all non-clerical hourly production team members are required to wear a hardhat, ear plugs, and hair net and/or beard net (as necessary). Depending on the particular job, they may also be required to wear steel-toe boots.

Most workers in Processing and Slaughter use knives.  After their shift, some workers deposit soiled laundry (such as frocks, whites, Kevlar gloves, Kevlar sleeves, and cotton gloves) in a gondola on their way out of the plant.  The laundry is then washed and returned to each worker's locker before the start of their next shift. Defendant admits that it pays additional compensation, known as "K-Code," to employees who perform certain pre- and post-shift activities.  Defendant admits that prior to January 28, 2007, K-Code time was paid to team members who worked in a department with job positions requiring the use of a knife for pre- and post-shift time spent changing into and out of protective clothing.  Defendant admits that beginning on January 28, 2007, it began paying additional compensation to team members on particular jobs requiring the use of certain types of equipment and clothing.  Defendant admits that at the Madison facility, all hourly workers in the Training, Kill, Cut, Converting, Loin, and Ham departments currently receive additional pay known as K-Code for certain activities.

For purposes of summary judgment in this case, defendant admits that workers at the Madison facility during a typical 8-hour shift currently get a 25-minute break, five minutes of which is paid and 20 minutes of which is unpaid, and a 35-minute meal period, five minutes of which is paid and 30 minutes of which is unpaid.  Prior to

February 1, 2010, the workers got a paid 15-minute break and an unpaid 30-minute meal period.

During the class period, the plaintiffs' wage rates have ranged from $9.00 to $16.55 per hour.  From the beginning of the class period until January 28, 2007, the defendant paid four minutes per day in addition to gang time to all plaintiffs who were working in a department at the Madison plant in which knives were used.   The defendant contends it intended these four minutes to compensate the employees for certain donning, doffing, washing, walking, waiting, and related activities that knife-wielding employees performed before and after the shift. The four minutes was calculated based on a time study performed by IBP, Inc., Tyson's predecessor.  From January 29, 2007, to February 1, 2010, Tyson paid knife-wielding plaintiffs working at the Madison plant—based upon the amount of protective clothing they wore in the job they performed—between four and seven minutes per day in addition to gang time. Tyson intended these four to seven minutes to compensate employees for certain donning, doffing, washing, walking, waiting, and related activities they performed before and after the shift.  The number of minutes was calculated based on the original time study performed by IBP, Inc. in 1998, plus a walking time study performed by Tyson in 2006.  Some class members, however, were not paid any minutes in addition to gang time between January 29, 2007, and February 1, 2010, because they were non-knife-wielding employees who wore minimal protective clothing in the jobs in which they were working.  Defendant further admits that beginning on January 28, 2007, it began paying additional compensation to team members on particular jobs requiring the use of knives,

5

and no longer paid K-Code to team members not working in job codes requiring the use of knives.

Since February 1, 2010, Tyson has paid all plaintiffs working at the Madison plant at least 20 minutes in addition to gang time.  Tyson intends these 20 minutes to compensate employees for certain donning, doffing, washing, walking, waiting, and related activities they performed before and after the shift and during each of their two breaks (including the meal period that is at issue in this motion).  Some employees are also paid one to four additional minutes on top of the 20 minutes—based on the amount of protective clothing they wear for their job—to compensate them for the additional time it may take to perform these activities due to the amount of protective clothing they wear.

All of these additional minutes paid in addition to gang time, as described above, were coded separately in Tyson's payroll under a "K-Code."  Thus, Tyson sometimes refers to the minutes intended to pay employees for certain donning, doffing, washing, walking, waiting, and related activities they performed before and after the shift (and later, during breaks) as "K-Code time."  This "K-Code time" was also listed as a separate category of pay on each of the plaintiffs' weekly pay checks.  Early in the class period, this K-Code time was designated on the pay checks as "clothes changing."  Later, the designation changed to "pre/post shift."  Defendant admits that employees at the Madison facility have swipe cards that they use in the time clock system to register attendance.

Tyson admits that, although USDA regulations do not mandate a mid-shift clean-up of the production floors at the Madison facility, the Madison plant uses hoses to wash

down food contact surfaces on the Kill floor during the meal period, but generally does not do so on the Processing side (Cut and Converting).  Typically, the only wash-down that occurs on the Processing side during the meal period is the occasional hosing of the floor, which also occurs routinely throughout the shift while the employees are working on the line.  It further admits that no employee in the Kill Department is required to leave the production floor during the meal period and if an employee chooses not to leave the floor, he or she is not required to don or doff any sanitary or protective items.

During the meal period, certain cleaning of the food contact surfaces takes place on the Kill floor.  This cleaning is performed by a third-party company with which Tyson has a contract. Currently, no Tyson employees perform this cleaning during the meal period, but at one time it was performed by two Tyson employees who held janitor positions.

Tyson further admits that United States Department of Agriculture ("USDA") inspectors are stationed on the Kill floor and must be present to inspect certain portions of the production process during the entire time that the line is running.  The USDA inspectors are entitled to take a 30-minute meal break under their collective bargaining agreement with the government.  Accordingly, Tyson must cease production on the Kill floor for 30 minutes each day so that the on-site USDA inspectors can take their own meal period.  During the time the inspectors are away from the line and on their 30-minute meal period, the USDA prohibits Tyson from running the production line.  With respect to the meal period, plaintiffs are seeking compensation only for the donning, doffing, washing and related activities they claim to perform during the meal period.

Tyson admits that some employees are required to sanitize some equipment and tools prior to the beginning of the shift, but not all employees and not all equipment and tools.   Tyson admits that some Madison production workers wear and use some combination of the following items:   frocks, "whites" (Tyson issued pants and shirts), hard hats, ear plugs, hairnets, hard plastic arm guards, mesh aprons, mesh sleeves or Kevlar sleeves, scabbards, cotton gloves, rubber gloves, cut-resistant (Kevlar) gloves, polar sleeves, polar gloves, steel, hook, chain, belly guard, safety glasses, and mesh gloves.

Tyson admits that its Pork Food Safety and Quality Assurance document (Filing No. 122, Attachment 3, Plaintiffs' Ex. 13) states, "Employee hand carried personal equipment or utensils that directly contacts [sic] product will be cleaned and sanitized before daily use," and "Employee controlled, hand-carried equipment (gloves, arm guards, steels, hooks, scissors, scabbards, etc.) is cleaned and sanitized prior to the start of daily operations," however, Tyson denies that all employees wash or sanitize items prior to the start of daily operations.

The record shows that Tyson communicates and enforces these requirements to its production-related employees in a number of company publications disseminated to the employees such as "Good Manufacturing Practices" or "GMPs," and "Standard Sanitary Operation Procedures" or "SSOPs."   Those documents communicate the company's "strict guidelines for food handling."   Tyson also uses "Basic Food Safety Training" to communicate its food safety requirements and tells its employees that lack of food safety could lead to unsafe foods, regulatory action, name brand damage and lost consumer confidence.   Tyson instructs employees that they "must always protect

8

the product" by "keeping the product clean, cold and moving."   Employees are instructed about "proper equipment cleaning" and that they are not to "rush such tasks when nearing breaks/end of shift."   Employees are instructed to not "wash equipment on the floor or in the hand wash sinks" but use the "designated areas for equipment wash." Employees are also told they must "dip clean equipment in sanitizer tanks before and after shift," but denies that all employees actually do dip equipment in the sanitizer tank before and after their shifts.   Tyson also admits that employees are specifically instructed they must "wash hands routinely with soap" and "[d]efinitely after contaminating, after smoking, and after restroom use."   Tyson also instructs employees that hairnet/beardnet must be worn at all times when on the production floors.   If an employee by mistake contaminates the "product contact gloves" like touching a "green grate, hoses, pallets, cough/sneeze in gloves, etc." they are required to "wash and/or replace gloves before touching any product."

Tyson requires employees to store equipment in designated equipment storage areas.   Employees are not allowed to wear personal protective equipment (aprons, frocks, gloves, arm guards, etc.) outside the plant—including in the smoking lounge— but boots may be worn to and from home and are not required to be left in an employee's locker.   Tyson instructs its employees on what and how their equipment is to be stored in their designated lockers between shifts to promote sanitary conditions to avoid contamination.   For example, employees are not allowed to bring food or drink in the locker rooms, they can only store clean equipment, and they must properly hang equipment and put their boots on their locker floor.

For purposes of summary judgment in this case, Tyson also admits that it explains its food safety, GMP, SSOP policies to employees during orientation sessions. Tyson performs locker checks to see that the equipment in the employee's locker compared to the employee's equipment listed on his/her equipment card match up. Tyson specifically tells its employees that lack of food safety could potentially lead to unsafe foods, regulatory action, name brand damage and lost consumer confidence. Tyson's GMPs specifically note that the policies and guidelines were established so that "every assurance" is provided of wholesomeness and food safety to Tyson's customers.

Tyson admits its Employee Personal Equipment SSOP specifically requires that "Quality Assurance Inspectors and/or Production Supervisors" monitor employees as they enter the production floor to "verify that equipment is cleaned and sanitized prior to the start of daily operations." Production Supervisors are also required to monitor the procedures and effectiveness of employee equipment cleaning procedures post-shift 3 times per week (per department). Tyson provides each employee a locker, a laundry bag, a laundry pin and a combination padlock to store company issued equipment in designated locker rooms.  In orientation, employees are specifically trained on Tyson's "laundry procedure."

The plaintiffs' expert, Kenneth Mericle, performed a time study based on the videotaping of employees selected by Mericle's own team at the Madison plant on November 30, 2011, and December 1, 2011.  Plaintiffs' damages expert, Dr. Liesl Fox, has calculated damages for all of the class members based on their rate of pay and overtime rate during each individual week.  For purposes of his damages calculations,

Dr. Fox considered Dr. Mericle's calculations.  In addition, Dr. Fox has given Tyson full credit for the above described K-Code minutes.

Defendant admits that the Secretary of Labor of the Department of Labor ("DOL") brought an action against IBP charging that it had violated the overtime and record-keeping provisions of the FLSA in *Reich v. IBP, Inc.*, 820 F. Supp. 1315, 1318 (D. Kan. 1993), *aff'd* 38 F.3d 1123 (10th Cir. 1994), *reaff'd sub. nom., Metzler v. IBP, Inc.*, 127 F.3d 959, 962-963 (10th Cir. 1997) ("*Reich*").   The record shows that following the Supreme Court's decision in *Alvarez*, the Department of Labor issued a Wage and Hour Advisory Memorandum explaining the impact of *Alvarez* and reiterating its own long-held view that donning, doffing and gathering activities required to be performed in meat processing plants start and end the continuous workday.  *See* Filing No. 121, Index of Evid., Ex. 2 (2006 DOL Memo). In this Advisory Memo, the Labor Department specifically determined that simply obtaining personal protective equipment and gear (disregarding any distinction of whether the PPE is "unique" or "non-unique") at the beginning of the workday is a principal activity that triggers the commencement of the compensable workday. *Id.* ("the compensable day starts once the employee has obtained the gear required to be stored on the premises by taking an item out of a bin, a locker or another designated storage area.").

II.  Law

"The FLSA prohibits the employment of any person 'for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.'"  *Lopez v. Tyson Foods*, 690 F.3d 869, 874 (8th Cir.

2012) (quoting 29 U.S.C. § 207(a)(1)); *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005). An employee who sues for unpaid overtime has the burden of proving that he performed work for which he was not properly compensated. *Lopez*, 690 F.3d at 874. "Neither 'work' nor 'workweek' is defined in the statute." *Id.* (quoting *Alvarez*, 546 U.S. at 25). Although "[a]t one time, the Supreme Court defined work as 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business,'" the Supreme Court recently clarified "that 'exertion' was not in fact necessary for an activity to constitute 'work' under the FLSA." *Lopez*, 690 F.3d at 874 (quoting *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944), and *Alvarez*, 546 U.S. at 25).

The ultimate question of whether an employee falls within the FLSA's protection is a question of law. *Reich v. Stewart*, 121 F.3d 400, 404 (8th Cir. 1997). However, the amount of time an employee works and the duties he or she performs present factual questions. *Id.*; *see also De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 371-73 (3d Cir. 2007) (finding the undisputed facts established that the donning and doffing activity constituted "work" as a matter of law); *see generally Donovan v. Weber*, 723 F.2d 1388, 1391-1392 (8th Cir. 1984) ("The determination of enterprise coverage under the FLSA is one that must be resolved on the facts of each case, but is nevertheless a question of law"); *Walton v. Greenbrier Ford*, 370 F.3d 446, 450 (8th Cir. 2004); *Stewart v. Pafford Ambulance Servs., Inc.*, 2001 U.S. App. LEXIS 14418, *2 (8th Cir. 2000).

Whether an employee's activity is "work" does not end the compensability analysis. *Lopez*, 690 F.3d at 874. In the Portal-to-Portal Act, Congress excluded some

activities that might otherwise constitute work from the FLSA.  *Id.*  The Act excepts two categories:  (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.  *Id.* (quoting 29 U.S.C. § 254(a)); *see Alvarez*, 546 U.S. at 26–28.  "Whether an activity is preliminary or postliminary to principal activities for purposes of § 254(a)(2) of the Portal-to-Portal Act is a mixed question of law and fact because the precise nature of the employee's duties is a question of fact, while application of the FLSA to those duties is a question of law." *Baker v. Barnard Constr. Co., Inc.*, 146 F.3d 1214, 1216 (10th Cir. 1998); *see also Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 741 n. 19, 743 (1981).

"'[A]ctivities performed either before or after the regular work shift, on or off the production line, are compensable  .  .  .  if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by [29 U.S.C. § 254(a)(1) ].'" *Lopez*, 690 F.3d at 874 (quoting *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956)).  Further, "any activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity' under [29 U.S.C. § 254(a) ]." *Lopez*, 690 F.3d at 874 (quoting *Alvarez*, 546 U.S. at 37).

"The Department of Labor has a 'continuous workday rule,' generally defining an employee's 'workday' as 'the period between the commencement and completion on the same workday of an employee's principal activity or activities.'" *Lopez*, 690 F.3d at

874 (quoting 29 C.F.R. § 790.6(b)); *see Alvarez*, 546 U.S. at 29, 37 (describing and applying the continuous workday rule). "During the continuous workday, the compensability of all activities that otherwise satisfy the requirements of the FLSA is not affected by the Portal-to-Portal Act's exceptions." *Id.* The Eighth Circuit Court of Appeals acknowledges that in *Alvarez*, "the Supreme Court held that 'during a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded from the scope of [the Portal-to-Portal Act], and as a result is covered by the FLSA.'" *Id.* (quoting *Alvarez*, 546 U.S. at 37); *see also Steiner*, 350 U.S. at 252–53 (holding that the term "principal activity or activities" includes all activities that are an "integral and indispensable part of the principal activities" for which the employee is employed).

If an employer requires his employees to don and doff work clothes at the workplace, then donning and doffing are an integral and indispensable part of the workers' main activity and therefore a principal activity. *Steiner*, 350 U.S. at 256. In *Alvarez*, the United States Supreme Court held that when donning and doffing is required, the time the worker spends walking from the locker room to the worksite is not time walking to and from a principal activity, but instead time walking between principal activities, and so is not within the exemption created by the Portal-to-Portal Act, just as if the worker were a millwright who inspects, repairs, replaces, installs, adjusts, and maintains mechanical equipment in different parts of the steel mill and to do these tasks must walk from one piece of equipment to another. *See Alvarez*, 546 U.S. at 37. "Because doffing gear that is 'integral and indispensable' to employees' work is a

14

'principal activity' under the statute, the continuous workday rule mandates that time spent waiting to doff is not affected by the Portal-to-Portal Act and is instead covered by the FLSA." *Id.*

Donning and doffing food safety uniforms and protective gear at the beginning and end of work shifts at food processing plants have been held to be activities that are an integral and indispensable part of the principal activity of employment and thus are principal activities. See *Perez v. Mountaire*, 650 F.3d 350, 364-65 (4th Cir. 2011). Under the Ninth Circuit's decision in lower court proceedings in *Alvarez,* the donning and doffing of protective gear at the beginning and the end of a work shift are defined as acts "integral and indispensable" to the employer's principal activity when the donning and doffing are: 1) necessary to the principal work performed; and 2) primarily benefit the employer. See *Alvarez v. IBP, Inc.,* 339 F.3d 894, 902-03 (9th Cir. 2003), *aff'd*, 546 U.S. 21 (2005). An act is necessary to a principal activity if that act is required by law, by company policy, or by the nature of the work performed. *Id.* at 903 (citing 29 C.F.R. § 790.8(c) n.65); *see also Franklin v. Kellogg Co.,* 619 F.3d 604, 619-20 (6th Cir. 2010); *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1344 (11th Cir. 2007).

In the meat or poultry processing industry, "[t]he donning and doffing of the employees' protective gear at the beginning and end of work shifts is necessary to their work on the 'production line.'" *Perez,* 650 F.3d at 367 (stating "[t]he overriding concerns of safety and sanitation plainly mandate this conclusion."). Employees of poultry and meat processing facilities are required as a matter of federal law to wear certain protective gear on the "production line." See 29 C.F.R. § 1910.132(a); 9 C.F.R. § 416.5; *see Perez*, 650 F.3d at 366 (stating that these legal requirements are based on

regulations concerning sanitation promulgated by the United States Department of Agriculture, and on safety regulations established by OSHA). Because of the importance of protective gear in establishing the safety and sanitation of the "production line" in a meat-packing plant, employees' acts of donning and doffing at the beginning and the end of their work shifts primarily benefit the employer. *Perez*, 650 F.3d at 367; *see Alvarez*, 546 U.S. at 37.

The DOL has promulgated a regulation relating to meal periods. That regulation states as follows:

> Bona fide meal periods are not worktime. Bona fide meal periods do not include coffee breaks or time for snacks. These are rest periods. The employee must be completely relieved from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period. A shorter period may be long enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating. For example, an office employee who is required to eat at his desk or a factory worker who is required to be at his machine is working while eating.

29 C.F.R. § 785.19(a). The Eighth Circuit Court of Appeals has rejected the "completely-relieved-from-duty" standard in favor of the "predominantly-for-the-benefit-of-the-employer" standard. *Lopez*, 690 F.3d at 881; *Henson v. Pulaski County Sheriff Dep't,* 6 F.3d 531, 533-35 (8th Cir. 1993) (concluding "that the predominantly-for-the-benefit-of-the-employer standard provides the appropriate test for determining the compensability of meal periods under the FLSA" and noting that the DOL regulations "do not bind us, as it is the courts that ultimately interpret the FLSA"); *accord Lamon v. City of Shawnee, Kansas*, 972 F.2d 1145, 1157 (10th Cir. 1992); *Hill v. United States,* 751 F.2d 810, 814 (6th Cir. 1984) (stating a meal period is bona fide "[a]s long as the employee can pursue his or her mealtime adequately and comfortably, is not engaged

in the performance of any substantial duties, and does not spend time predominantly for the employer's benefit, the employee is relieved of duty and is not entitled to compensation under the FLSA.").  When employees seek compensation only for the time periods in which the acts of donning and doffing occur, the court is not confronted with the issue of whether the entire meal period predominately benefits the employer, but instead decides whether the time periods during which these activities occur, and for which compensation is sought, predominately benefit the employer.  *Perez*, 650 F.3d at 369.

The *de minimis* doctrine provides a limiting principle to compensation for trivial calculable quantities of work.  *De Asencio,* 500 F.3d at 373-74.  The work week contemplated under the FLSA:

> must be computed in light of the realities of the industrial world.  When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded.  Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act.  It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.

*Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 692 (1946).  Courts applying the *de minimis* rule should consider three things:  (1) the practical difficulty of recording the compensable time, (2) the aggregate amount of time at issue, and (3) the regularity with which the task is performed.  *See Rutti v. Lojack Corp.*, 596 F.3d 1046, 1056–57 (9th Cir. 2010); *De Asencio,* 500 F.3d at 374; *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 594 n.7 (2d Cir. 2007); *Brock v. City of Cincinnati*, 236 F.3d 793, 804 (6th Cir. 2001); and *Reich v. Monfort, Inc.*, 144 F.3d 1329, 1333 (10th Cir. 1998) (finding that donning and doffing time of ten minutes was not *de minimis*).  In assessing whether a

claim is *de minimis*, courts consider the size of the aggregate claim.  *Lindow*, 738 F.2d at 1063.  Courts have granted relief for claims that might have been minimal on a daily basis but, when aggregated, amounted to a substantial claim.  *Id.*; see *Addison v. Huron Stevedoring Corp.*, 204 F.2d 88, 95 (2d Cir. 1953) (less than $1.00 per week not *de minimis*); *Glenn L. Martin Nebraska Co. v. Culkin*, 197 F.2d 981, 987 (8th Cir. 1952) (30 minutes per day over one and one-half years not *de minimis*); *Saunders v. John Morrell & Co.*, 1992 WL 531674, *2 (N.D. Iowa 1992) (finding the plaintiffs' claims were not *de minimis* as a matter of law); *Schimerowski v. Iowa Beef Packers, Inc.*, 196 N.W.2d 551, 555-56 (Iowa 1972) (15 minutes per day, amounting to verdicts ranging from $248.04 to $508.44, not *de minimis*). [3]

In compensating for "work," the FLSA contemplates compensation for actual, not reasonable, time.  *See Alvarez*, 546 U.S. at 37 (adopting "continuous workday" logically mandates actual time); s*ee Helmert v. Butterball*, 805 F. Supp. 2d 655, 665 (E.D. Ark. 2011) (explaining that although damages may be awarded on a reasonable basis, the FLSA requires employers to compensate their employees for actual hours worked); *Jordan v. IBP, Inc.*, 2004 WL 5621927, *13 (M.D. Tenn. 2004) (noting that the *Reich* injunction does not merely require the employer to compensate employees for reasonable time spent in the activities as a prospective matter); *Garcia v. Tyson Foods,*

---

[3] Some courts have found, however, that tasks that take less than 10 minutes each working day are *de minimis*.  *Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984) (collecting cases).  The Office of Personnel Management, which handles wages of federal civilian employees, has adopted a 10-minute rule by regulation.  5 C.F.R. § 551.412(a)(1).

*Inc.*, 474 F. Supp. 2d 1240, 1248 (D. Kan. 2007) (same).[4]  The term "employ" is defined in section 203(g) expansively as "to suffer or permit to work." *United States v. Rosenwasser*, 323 U.S. 360, 363 (1945).  The FLSA "typically requires employers to pay their employees for all time spent working on their behalf." *Smith v. Aztec Well Serv. Co.*, 462 F.3d 1274, 1285 (10th Cir. 2006); *see Mumbower v. Callicott*, 526 F.2d 1183, 1188 (8th Cir. 1975).

The "reasonableness" inquiry comes into play "as a benchmark for courts to assess the amount of overtime compensation to which a plaintiff is entitled where that amount is uncertain or unrecorded by his or her employer." *Bull v. United States,* 68 Fed. Cl. 276, 278-79 (2005), *aff'd,* 479 F.3d 1365 (Fed. Cir. 2007).  When the employer has failed to record compensable time and the employees have proved that they actually performed the work in question, the plaintiffs need only produce evidence sufficient to support a reasonable inference of the amount and extent of that work. *Anderson*, 328 U.S. at 687; *Metzler,* 127 F.3d at 965-66.  "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee [s'] evidence."  *Anderson*, 328 U.S. at 687-88.  "The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [the FLSA]." *Id.* at 688.

---

[4] This statement is not at odds with the Eighth Circuit's holding in *Lopez,* 690 F.3d at 878.  The court therein held only that the plaintiffs had not preserved the issue, and on plain error review, found the error, if any, did not affect the plaintiffs' substantial rights.  *Id.*

The Nebraska Wage Payment and Collection Act, specifically Neb. Rev. Stat. § 48-1229(4), defines the term "wages" very broadly as follows: "Wages means compensation for labor or services rendered by an employee, including fringe benefits, when previously agreed to and conditions stipulated have been met by the employee, whether the amount is determined on a time, task, fee, commission, or other basis." Neb. Rev. Stat. § 48-1229 (4) (emphasis added).  Under Nebraska law, the statutory words "previously agreed to and conditions stipulated have been met" require only that the employer has "agree[d] to pay plaintiffs at the appropriate rate of pay for the duties they were performing." *Hawkins v. City of Omaha*, 627 NW 2d 118, 130 (2001).  The Nebraska Wage and Hour Act was enacted to establish a minimum wage for all workers and to safeguard existing minimum wage compensation standards. Neb. Rev. Stat. § 48-1201.  The Wage and Hour Act requires employers to pay each employee wages at a minimum rate. Neb. Rev. Stat. § 48-1203(1).  Also, the provisions of FLSA set the minimum wage in terms of an hourly rate. *See* 29 U.S.C. § 206(a).  A violation of § 206(a) occurs when an employee is paid at a rate that is below the minimum rate. *Id.* The statute requires the payment of a minimum wage to "employees who in any workweek [are] engaged in commerce," 29 U.S.C. § 206(a), and sets the minimum wage in terms of an hourly rate. *Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353, 357 (8th Cir. 1986).  With respect to the FLSA's minimum wage requirement, "no violation occurs 'so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum

hourly statutory requirement.'"  *Id.* (quoting *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir. 1960)) (known as "*Klinghoffer* rule").

### III.  DISCUSSION

#### A.  Plaintiffs' Motion

The court first finds that undisputed evidence establishes that the plaintiffs are entitled to judgment as a matter of law on their claim for donning and doffing of "knife-related" protective gear as well as other sanitary gear required by Tyson.  The plaintiffs base their motion, in part, on the preclusive effect of the injunction entered in *Reich v. IBP*, 820 F. Supp. 1315, 1327 (D. Kan. 1993), *aff'd*, 38 F.3d 1123 (10th Cir. 1994), *reaff'd sub nom., Metzler v. IBP, Inc.*, 127 F.3d 959, 962-963 (10th Cir. 1997).  The *Reich* case established that the donning and doffing of Tyson's knife-related protective equipment at the Madison plant is compensable "work" covered by the FLSA and is not excluded from coverage by the Portal Act.  *Id.* at 1326.

The defendant vehemently argues that the *Reich* case should not be afforded preclusive effect.  The court need not address res judicata or collateral estoppel issues since the court finds it is not necessary to rely on *Reich* in making this determination.  Supreme Court precedent applied to the undisputed facts in this case mandates that donning and doffing protective as well as sanitary or standard equipment (i.e., frock, white pants, white shirt, rubber apron, rubber gloves, cotton gloves, hairnet, beardnet, ear plugs, hardhat and safety glasses) at the beginning and end of the continuous workday is work entitled to compensation under the FLSA.  *See Alvarez*, 546 U.S. at 37; *Steiner*, 350 U.S. at 256.   Further, the concomitant walking and transportation connected to that activity is compensable.  *See Alvarez*, 546 U.S. at 28-30, 37.  The

undisputed evidence and Tyson's own admissions establish that the donning and doffing of those articles is required by Tyson, is necessary for an employee to perform his or her job, and primarily benefits Tyson. Since the *Alvarez* decision, the Department of Labor has made it clear that it regards the donning and doffing of such gear to be compensable work under the FLSA. It is undisputed that the protective and sanitary items of clothing are either required by law, company policy or the nature of the work.

On this record, no reasonable juror could find that these activities are not primarily for the benefit of the employer. Notwithstanding the incidental benefit to employees of warmth and protection from injury, it is clear that Tyson derives the primary benefit of the equipment. Maintaining sanitary conditions is of the utmost importance in a meat processing facility. Protecting employees from injury provides a benefit to the employer as well as to the employee by limiting workers' compensation claims. If the employees did not wear the items at issue, the employer would be unable to maintain a processing facility that would comply with federal and state food safety laws. The reputation of the company, its "branding" efforts, and consumer confidence in its products are dependent on the sanitary conditions of its plants.

It is undisputed that employees are required by Tyson to wear most, if not all, of the equipment. Tyson's own documents and materials show the importance of such sanitary equipment and the emphasis the company places on food safety. Tyson cannot seriously dispute that the primary purpose of the personal protective equipment and sanitary clothing is to protect its production line and products from contamination. Accordingly, the court finds as matter of law that such activities are compensable.

The same logic applies to the unpaid time that employees are required to spend donning, doffing and sanitizing at the beginning and end of their meal period. Donning and doffing at mealtime is no less a principal activity in the middle of the day than at the beginning of the shift. The articles remain integral and indispensable to the employees' duties. Donning and doffing for meals is also for the company's benefit to avoid bacteria and other contaminants being brought back to the production area on return from the shutdown/meal period. Any benefit that inures to the employees in that they can dine without blood and meat products on their clothing is vastly overshadowed by the benefits to the employer in maintaining a sanitary production facility. The court finds that these donning and doffing activities predominantly benefit the employer. Undisputed evidence shows that donning and doffing the articles after meal and restroom breaks enables the defendant to meet federal regulations requiring employees to wear clean garments and the company to maintain hygienic practices on the production floor. The benefit of such practices to the defendant is great in consideration of the potential for damages that could result from selling a contaminated food product. Accordingly, the court finds as a matter of law that time spent donning and doffing at meal time is work entitled to compensation under the FLSA and cannot be regarded as part of the bona fide meal period carved out of the continuous workday.

The court also finds that the undisputed evidence and Tyson's admission show that the uncompensated time cannot be regarded as *de minimis*. It is undisputed that the donning and doffing activities occur regularly, in fact, every workday. The plaintiffs have produced evidence that they lose some part of every 30-minute unpaid meal period to these activities, as well as time at the beginning and end of their shifts.

Although the parties disagree on the amount of time that should be compensated, there is no dispute that the uncompensated activities add up to several minutes a day, which in the aggregate amounts to more than a *de minimis* amount as compared to the plaintiffs' wages.  Tyson has not shown that it would be impossible or impractical to record and pay for the donning and doffing activities.  It admits that it has a time-keeping system.  That system could be modified to include the donning, doffing and sanitizing time and any potential "time-wasting" issues can be adequately addressed through the development of sound managerial and human resources policies.

The court also finds as a matter of law that Tyson is required to pay employees for their actual time spent performing company-required donning, doffing, walking and sanitizing.  "Reasonable time" is relevant only as it relates to determination of a backpay award, if actual time cannot be calculated.

There are factual disputes regarding the time it takes the employees to don and doff the clothing and equipment, and as to whether the additional time Tyson has provided for such activities is sufficient.  The court also finds there are genuine issues of material fact with respect to Tyson's affirmative defense of "good faith" under §§ 259 and 260 of the FLSA.  Issues of intent and motivation generally require assessments of credibility.  Accordingly, the court finds that the plaintiffs' motion for summary judgment on that issue should be denied.

### B.   Defendant's Motion

The court finds the defendant's motion to dismiss the plaintiffs' state law claims should be denied.  The defendant has presented no authority for the proposition that the "Klinghoffer rule" on averaging weekly wages to determine minimum wage applies to

the Nebraska Wage and Hour Act or that it applies in the absence of any agreement to that effect.  In view of the fact that there are material factual disputes over the amount of unpaid wages due the plaintiffs, defendant's motion to dismiss the Nebraska Wage and Hour Act claim will be denied at this time, without prejudice to reassertion at trial.

The court also finds the defendant's motion should be denied with respect to the Nebraska Wage Payment and Collection Act, Neb. Rev. Stat. § 48-1228 *et seq.*  The defendant asserts the plaintiffs cannot prove that they are owed compensation under the statute because "(1) they cannot determine that the alleged 'wages' owed were previously agreed to by defendant; and (2) they cannot demonstrate that they have met any conditions that were stipulated to."  These are the same grounds advanced and rejected in *Lopez v. Tyson*, No. 8:06CV459, Filing No. 235, Memorandum and Order at 26 (D. Neb. April 6, 2011).  The court again rejects both of defendant's arguments.  *Id.* at 26-27.  Plaintiffs are/were hourly production employees of the defendant; they may use the NWPCA as a mechanism for collecting any uncompensated wages.  Thus, defendant's motion for summary judgment on plaintiffs' NWPCA claim will be denied.

For the reasons stated above in connection with plaintiffs' motion for summary judgment on the meal break claims, the court finds the defendant's motion for summary judgment in its favor on the plaintiffs' mid-shift donning and doffing claims should be denied.

IT IS HEREBY ORDERED:

1.   The plaintiffs' motion for summary judgment (Filing No. 119) is granted in part and denied in part as set forth in this order.

2.   The defendant's motion for summary judgment (Filing No. 117) is denied.

3.   The plaintiffs' motion for leave to file a declaration attesting to the accuracy of the plaintiffs' exhibits filed in support of their motion for summary judgment (Filing No. 180) is granted.

4.   The defendant's motion for leave to file a surreply brief (Filing No. 186) is granted.

Dated this 14th day of December, 2012.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge